UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 19-40211
                                                Jointly Administered
SKYMARK PROPERTIES II, LLC, et al.,[1]
                                                Chapter 11
                    Debtors.
                                                Judge Thomas J. Tucker

_____/

## OPINION REGARDING THE DEBTOR'S CASH COLLATERAL MOTION

### I. Introduction

These jointly-administered cases came before the Court for a hearing on February 6,

2019, on three motions, namely:

(1) the joint motion by state court receiver NAI Farbman (the "Receiver") and secured

creditor Southfield Metro Center Holdings, LLC (the "Lender") entitled "Joint Motion by

Receiver NAI Farbman and Secured Creditor Southfield Metro Center Holdings LLC (I) to

Dismiss or Suspend the Bankruptcy Case, or in the Alternative, (ii) for Relief under Section

543(c) and (d) of the Bankruptcy Code" (Docket # 32 in Case No. 19-40248, the "Joint Dismissal

Motion");

(2) the motion by the Lender entitled "Motion by Secured Creditor Southfield Metro

Center Holdings LLC to Dismiss or Suspend the Bankruptcy Case" (Docket # 24 in Case No. 19-

40211, the "Dismissal Motion"); and

(3) the motion by the Debtor Skymark Properties SPE, LLC entitled "Debtors' Motion for

Entry of an Interim and Final Order Permitting the Use of Cash Collateral" (Docket # 60 in Case

_____

[1] This case is being jointly administered with the case of Skymark Properties SPE LLC, Case
No. 19-40248.

No. 19-40248, the "Cash Collateral Motion").[2]

On February 7, 2019, confirming action taken by the Court at the conclusion of the February 6, 2019 hearing, the Court entered an order requiring certain parties to supplement the record in specific ways.[3] The required supplements have been filed.[4] The Court has reviewed the motions, the briefs in support of the motions, the responses to the motions, the replies in support of the motions, all exhibits attached to the pleadings, the supplements filed in response to the February 7 Order, and the entire record, and concludes that, for the following reasons, no further hearing is required, and that the Cash Collateral Motion must be denied, and the Joint Dismissal Motion and the Dismissal Motion should be granted. This opinion concerns only the Cash Collateral Motion. Today the Court is filing a separate opinion regarding the Joint Dismissal Motion and the Dismissal Motion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(M) and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed

---

[2] Although the Debtors' cases are being jointly administered, the Cash Collateral Motion was filed only in the case of the Debtor SPE.

[3] *See* "Order Regarding Motions Heard on February 6, 2019 (Docket # 66 in Case No. 19-40211, the "February 7 Order").

[4] *See* Docket ## 67, 69, 71, 75, 82 in Case No. 19-40211.

to be core proceedings. *See Allard v. Coenen (In re Trans–Industries, Inc.)*, 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code § 363. And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## III. Background

### A. The Debtors and their properties

Debtor Skymark Properties SPE, LLC ("SPE") owns three towers (Towers 100, 200, and 300) of a commercial office building located at 27100, 27200, and 27300 West Eleven Mile Road, Southfield, Michigan, containing approximately 537,605 square feet of rentable floor space. The commercial space in Tower 300 is fully occupied. Tower 100 is 46.20% occupied, and Tower 200 is only 9.79% occupied. The consolidated occupancy of all three towers collective is 42.36%.[5] Stefanini, Inc. ("Stefanini"); Federal-Mogul Corporation ("Federal-Mogul"), n/k/a Tenneco, Inc. ("Tenneco"); and Sterling Food Services are three of the tenants of SPE. Stefanini occupies approximately 49,071 of rentable square feet in Tower 100, consisting of "3 entire floors, and a portion of [the] first floor of Tower 100[.]"[6] Tenneco occupies 3,550

---

[5] *See* Ex. L to Docket # 32-2 in Case No. 19-40248 ("Farbman Management Group October 2018 - September 2019 Metro Office Complex Consolidated Summary," (the "Consolidated Summary") at pdf. p. 59. Towers 100, 200, and 300 are collectively referred to as the "Metro Office Complex" in the Consolidated Summary.

[6] *See* Ex. L to Docket # 32-2 in Case No. 19-40248 (the Consolidated Summary) at pdf. p. 59; Aff. of Christopher Mourad (Docket # 32-1) at pdf. p. 87. Christoper Mourad is the General Counsel for Stefanini.

3

square feet on the first floor of Tower 100 and the corridor between Towers 200 and 300.[7]

Debtor Skymark Properties II LLC ("Skymark II") owns the fourth tower (Tower 400) of the commercial office complex. Tower 400 is located at 27350 West Eleven Mile Road, Southfield, Michigan, has no tenants, is unoccupied, and is not currently fit for occupation.

Skymark Properties Corporation ("SPC") is the sole member of each of the Debtors. Liberty and York Corporation ("L&Y") is the sole shareholder of SPC. L&Y has a single shareholder, but there is a dispute as to who is currently that shareholder. Laila Alizadeh ("Alizadeh") and Morteza Katebian a/k/a Ben Katebian ("Katebian") each allege to be the sole shareholder of L&Y.[8]

**B. The pre-petition loans**

Pre-petition, the Debtors SPE and Skymark II (collectively, the "Debtors" or "Borrower") obtained a loan in the original principal amount of $17.35 million (the "Loan") from GreenLake Real Estate Fund LLC ("GreenLake").

**1. The original loan documents**

In connection with the Loan, on December 30, 2016, the Debtors, by SPC, their sole member, and through SPC's authorized agent Katebian, signed a document entitled "Promissory Note Secured by Mortgage" (the "Promissory Note"),[9] promising to repay the principal loan amount of $17.35 million at a fixed non-default interest rate of 11%, as well other sums

---

[7] *See* Ex. L to Docket # 32-2 in Case No. 19-40248 (the Consolidated Summary) at pdf. p. 59.

[8] Katebian filed a lawsuit in the United States District Court for the Eastern District of Michigan against the Debtors and others, Case No. 18-13379, alleging that he is the sole shareholder of L&Y and is authorized to act on its behalf. That case is currently pending.

[9] A copy of the Promissory Note is attached as Exhibit 1 to Docket # 55 in Case No. 19-40211.

4

provided for in the Promissory Note, according to the terms of the Promissory Note.[10]  The

Promissory Note provided for a balloon payment of the outstanding amounts due on the

"Maturity Date" of December 31, 2019.[11]  The Promissory Note was "secured by a first priority

Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the

'Mortgage') of [December 30, 2016] on the Property [as defined in the Promissory Note] and the

other Loan Documents."[12]  "Property" was defined in paragraph 1.19 of the Promissory Note as

follows:

> The real property located at 27100, 27200, 27300 and 27350 (the
> "**100, 200 and 300 Towers**") West Eleven Mile Road, Southfield,
> Michigan consisting of the following
> Tax Parcel Numbers:
> 24-18-351-Q16,
> 24-18-351-Q17, and
> 24-18-351-QlB
>
> And for the Tower 400 Funding, 27350 West Eleven Mile Road,
> Southfield, Michigan with (the "**400 Tower**") Tax Parcel Number
> 24-18-351-D07
>
> as more particularly described in the Mortgages[13]

The reference to "Tower 400 Funding" was a reference to a loan that Skymark II had obtained

from Mercury Capital Funding LLC ("Mercury") "in the amount of $1,300,000" (the "Mercury

---

[10]  *See* Promissory Note (Ex. 1 to Docket # 55-2 in Case No. 19-40211) at pdf. p. 1, 19-20.  The
typewritten name of Katebian under his signature line is misspelled as "Katabian."  It is likewise
misspelled under signature lines in other Loan Documents.

[11]  *Id.* at 1 ("**Notice to Borrower**"), ¶ 1.6 ("**Maturity Date**") (bold in original).

[12]  *Id.* at pdf. pp. 2 ¶ 1.19 ("**Property**"), 14 ¶ 13 ("**Mortgage**") (bold and underlining in original).

[13]  *Id.* at pdf. p. 2 ¶ 1.19 ("**Property**") (bold in original).

5

Loan").[14] SPE had guaranteed the Mercury Loan. On account of that loan, Tower 400 was encumbered, and "Mercury filed a UCC financing statement against the 100, 200, & 300 Towers."[15] Out of the proceeds from the $17.35 million loan amount, "$1,300,000 [was] to be held back by Lender . . . to be used to refinance the debt in favor of Mercury . . . ."[16]

Under the Promissory Note, the "Loan Documents" are:

(a)     [The Promissory] Note

(b)     The Guaranty

(c)     The Mortgage for the 100, 200 & 300 Towers

(d)     The Mortgage for the 400 Tower

(e)     Correction Agreement

(f)     Pledge and Security Agreement for the 100, 200 and 300 Towers

(g)     Pledge and Security Agreement for the 400 Tower;

(h)     Lease Subordination Agreements for each Tenant;

(I)     any other documents evidencing or securing the obligations under this Note, as such documents may be modified from time to time.[17]

The Promissory Note, in relevant part, required that Troy Wilson ("Wilson") "shall at all times be the employee of the [Debtors] or [their] affiliates who is principally responsible for the

---

[14] *Id.* at pdf. p. 5 ¶ 1.22(i)i.1.

[15] *Id.*

[16] *Id.* at pdf. p. 2 ¶ 1.11(d) ("**Use of Loan Proceeds**") (bold in original).

[17] *Id*. at pdf. p. 3 ¶ 1.20 ("**Loan Documents**") (bold in original).

6

day to day management of [Towers 100-400]" and the Debtors' business operations.[18]  The

Promissory Note also required that "SPC shall at all times own 100% of [the Debtors];" that

"L&Y shall at all times own 100% of SPC;" and that "Morteza Katebian shall at all times own

100% of L&Y."[19]  SPC, L&Y and Katebian each personally guaranteed the amount due and other

obligations of the Debtors under the terms of the Promissory Note, and they were all jointly and

severally liable on such guaranty.[20]

The Promissory Note noted that one of the tenants of SPE—Federal-Mogul, had the right

to reduce the percentage of the space it was leasing in Tower 100.  It stated, in relevant part: "The

lease with Federal-Mogul gives the tenant the option to relinquish up to 50% of the Premises in

exchange for a termination fee of 24 months' rent for the space relinquished."[21]

"Upon an occurrence and during the continuance of an Event of Default" under the

Promissory Note, GreenLake had the right, among other things, to "[d]eclare the total unpaid

principal balance of the indebtedness evidenced [in the Promissory Note], together with all

accrued but unpaid interest thereon and all other sums owing, immediately due and payable and

all such amounts shall thereafter bear interest at the Default Rate."[22]

Paragraph 15 of the Promissory Note defined an "Event of Default."  It stated:

---

[18] *Id.* at pdf. p. 3 ¶ 1.22(a) ("**Additional Covenants**") (bold in original).

[19] *Id.* at ¶ 1.22(b) ("**Additional Covenants**") (bold in original).

[20] *Id*. at pdf. pp. 1 ¶ 1.9 ("**Guaranto**r"), 9 ¶ 4.3 ("Guarantor") (bold and underlining in original).

[21] *Id.* at pdf. p. 4 ¶ 1.22(d) (Federal-Mogul Reduction of Premises) (underlining in original).  A copy of the Lease referred to in the Promissory Note between SPE and Stefanini is attached as Ex. D to Docket # 32-1 in Case No. 19-40248 at pdf. pp. 38-72.

[22] *Id.* at pdf. p. 15 ¶ 16.

15.      Defaults; Acceleration. The occurrence of the following shall be deemed to be an event of default ("Event of Default") hereunder:

15.1.      Borrower's failure to pay (as a result of insufficient balance in the Account) any payment of principal or Interest due (plus any applicable late fee) within 5 business days after due pursuant to the terms of this [Promissory] Note;

15.2.      Any failure to comply with any covenant, condition or obligation under the terms of this [Promissory] Note which is not cured within 15 days after written notice to Borrower, or if more time is reasonably required to cure the default given the nature of the default, then up to 30 days after written notice to Borrower;

15.3.      Any representation or warranty under this Agreement was inaccurate when made or becomes inaccurate;

15.4.      Any default under the terms of the Mortgage or other Loan Documents or any guaranty executed in connection with this [Promissory] Note;

15.5.      There is a material adverse change in the financial condition of Borrower or any guarantor for the Loan, or the physical condition of the Property or the improvements thereon which could materially affect Borrower's ability to perform its obligations under the Loan Documents or Guarantor's ability to perform its obligations under the Guaranty;

15.6.      **The occurrence of any Bankruptcy Event**; or

15.7.      Borrower sells any portion of the Property in violation of the restrictions on transfer contained in the Mortgage.[23]

One of the Events of Default, a "Bankruptcy Event," is defined to include:

(5) (the appointment of a receiver (other than a receiver appointed at the direction or request of [the] Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over

---

[23] *Id*. at pdf. p.15 ¶ 15 (emphasis added).

8

Borrower or any substantial part of the assets of any Borrowers[.][24]

In conjunction with execution of the Promissory Note, on December 30, 2016, SPE granted GreenLake a mortgage (the "Mortgage") on the properties it owned located at 27100, 27200, and 27300 West Eleven Mile Road, Southfield, Michigan (Towers 100-300) to secure the loan amount and its other obligations to GreenLake under the Promissory Note.[25] The Mortgage defined "Loan Documents" as "(I) The Promissory Note, (ii) this Mortgage, (iii) any documents defined as Loan Documents in the Promissory Note and (iv) other documents delivered by Mortgagor in connection therewith."[26]

In Section 3.13 of the Mortgage, the Mortgagor promised to "preserve and protect the Property" and to "ensure that the Property is maintained in good condition and repair."[27]

Article 5 of the Mortgage is captioned "**ASSIGNMENT OF RENTS AND LEASES** [(bold and underlining in original caption)]." It provides, in relevant part:

> Section 5.1 **Assignment**. To secure the payment of the Indebtedness and the . . . performance and discharge of the Obligations, **Mortgagor hereby absolutely and unconditionally assigns, sells, transfers and conveys to Mortgagee all of its right, title and interest in and to all Leases, whether now existing or hereafter entered into, and all of its right, title and interest in and to all Rents.** Mortgagee does not assume any of Mortgagor's liabilities under any leases by this assignment. **This assignment is an absolute assignment and not an assignment**

---

[24] *Id.* at pdf. p. 7 ¶ 1.26(b).

[25] A copy of the Mortgage is attached as Exhibit C to Docket # 72-3 in Case No. 19-40248 at pdf. pp. 11-44.

[26] Ex. C to Docket # 72-3 in Case No. 19-40248 at pdf. p. 13 Art. 1, § 1.1(g).

[27] *Id.* at pdf. p. 23 Art. 3, § 3.13 ("**Maintenance of Property**") (bold and underlining in original).

9

**for additional security only.  So long as no Event of Default shall have occurred and be continuing, Mortgagor shall have a revocable license from Mortgagee to exercise all rights extended to the landlord under the Leases, including the right to receive and collect all Rents and to hold the Rents in trust for use in the payment and performance of the Obligations and to otherwise use the same. The foregoing license is granted subject to the conditional limitation that no Event of Default shall have occurred and be continuing.  Upon the occurrence and during the continuance of an Event of  Default,** whether or not legal proceedings have commenced, and without regard to waste, adequacy of security for the Obligations or solvency of Mortgagor, **the license herein granted  shall automatically expire and terminate, without notice by Mortgagee (any such notice being hereby expressly waived by Mortgagor).** Mortgagor further agrees that it will, from time to time, upon demand therefor, deliver to Mortgagee an executed counterpart of each and every Lease then affecting all or any portion of the Property.

Section 5.2    **Collection of Rents**.  If an **Event of Default** occurs under this Mortgage, or any of the other Loan Documents, then, to the extent permitted by law,: Mortgagee may collect the Rents, personally or through a receiver, (I) as long as the default exists, including during the pendency of any foreclosure proceedings, and/or during any redemption period.  The collection of such Rents by Mortgagee shall in no way waive the right of Mortgagee to foreclose this Mortgage in the event of such an Event of Default.  Mortgagor consents to a receiver if Mortgagee thinks it is necessary or desirable, in its sole and absolute discretion, to enforce its rights under this provision. Mortgagee shall be entitled to all the rights conferred by [Mich. Comp. Laws Ann. §] 554.231 et seq., MSA 26.1137(1) et seq. and [Mich. Comp. Laws Ann. §] 554.211 et seq., MSA 26.1131et seq.  **Mortgagor hereby consents to and authorizes and directs the lessees under the Leases and any successors to the interest of said lessees, upon demand and notice from Mortgagee of Mortgagee's right to receive the Rents and other amounts under such Leases, to pay to Mortgagee the Rents and other amounts due or to become due under the Leases, and said tenants shall have the right to rely upon such demand and notice from Mortgagee and shall pay such Rents and other amounts to Mortgagee without obligation or right to determine the actual existence of any default or**

10

event claimed by Mortgagee as the basis for Mortgagee's right to receive such Rents and other amounts notwithstanding any notice from or claim of Mortgagor to the contrary, and Mortgagor shall have no right or claim against said tenant for any such Rents and other amounts so paid by said tenant to Mortgagee.

Section 5.3 **Perfection Upon Recordation**. Mortgagor acknowledges that Mortgagee has taken all actions necessary to obtain, and that **upon recordation** of this Mortgage Mortgagee shall have, to the extent permitted under applicable law, **a valid and fully perfected, present assignment of the Rents arising out of the Leases and all security for such Leases.** To the extent permitted by applicable law, Mortgagor acknowledges and agrees that **upon recordation of this Mortgagee's interest in the Rents shall be deemed to be fully perfected, "choate" and enforced as to Mortgagor and all third parties**, including, without limitation, any subsequently appointed trustee in any case under the Bankruptcy Code without the necessity of commencing a foreclosure action with respect to this Mortgage, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

Section 5.4 **Bankruptcy Provisions**. Without limitation of the absolute nature of the assignment of the Rents hereunder, Mortgagor and Mortgagee agree that (a) this Mortgage shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Mortgage extends to property of Mortgagor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents and (c) such security interest shall extend to all Rents acquired by the estate after the commencement of any case in bankruptcy. **Notwithstanding this provision, the Mortgagor acknowledges that upon an Event of Default, the Rents shall constitute property of the Mortgagee and shall not constitute property of the Mortgagor's bankruptcy estate in any subsequently commenced case under the Bankruptcy Code.**[28]

"Any breach of or failure to perform any obligation under Mortgage or any of the Loan

Documents after any express cure period has elapsed [was] an 'Event of Default'" under the

---

[28] *Id.* at pdf. pp. 31-32 Art. 5, §§ 5.1-5.4 (emphasis added).

11

Mortgage.[29]   The Mortgage gave GreenLake the right, among other rights, to accelerate the entire

outstanding amount of the Loan upon an "Event of Default:"

> (a) <u>Acceleration</u>.   Declare the Indebtedness to be
> immediately due and payable, without notice, presentment, protest,
> notice of intent to accelerate, notice of acceleration, demand or
> action of any nature whatsoever (each of which hereby is expressly
> waived by  Mortgagor),whereupon the same shall become
> immediately due and payable.  At the  Mortgagee's option,
> Mortgagee may bring suit therefor and  take any and all steps and
> institute any and all other proceedings that Mortgagee deems
> necessary or advisable in its sole discretion to enforce its rights, to
> collect the Indebtedness and to enforce the Obligations, including
> without limitation all amounts due under the [Promissory] Note
> and other Loan Documents, and to protect the lien of this
> Mortgage.[30]

The Mortgage was recorded with the Oakland County Register of Deeds on January 9,

2017.[31]

## 2.  The Amended Loan Documents

On January 25, 2017, Skymark II, and SPE, as the "Borrower;" SPC, L&Y, and Katebian,

as the "Guarantor;" and GreenLake, as the "Lender," executed an amendment to the Promissory

Note, entitled "First Amendment to Promissory Note Secured by Mortgage" (the "Amended

Promissory Note").[32]   The Amended Promissory Note, in relevant part, increased the amount of

the Loan from $17.35 million to $17.7 million; provided for Tower 400, located at 27350 West

---

[29]  *Id.* at pdf. p. 26 Art. 4, § 4.1 ("**<u>Event of Default</u>**") (bold and underlining in original).

[30]  *Id.* at pdf. p. 26 Art. 4, § 4.2(a) ("<u>Acceleration</u>") (underlining in original).

[31]  *Id.* at pdf. p. 11.

[32]  A copy of the Amended Promissory Note is attached as Exhibit 2 to Docket # 55-2 in Case No. 19-40211.

Eleven Mile Road Southfield, MI, and owned by Skymark II, to serve as additional collateral to secure the increased loan amount, and amended some of the terms of the Loan.[33]  In the Amended Promissory Note, the parties "acknowledged that the term '400 Tower Funding' as provided in Section 1.11(d) of the [Promissory] Note contained a scrivener's error and should have been $1,350,000 [rather than $1,300,000]" and agreed that "the term '400 Tower Funding' shall hereinafter mean $1,700,000.000."[34]  Katebian signed the Amended Promissory Note on behalf of himself; SPC (as the "Sole Director"); L&Y (as the "Sole Director"); Skymark II (as "Authorized Person"); and SPE (as "Authorized Person").[35]

In conjunction with the execution of the Amended Promissory Note, SPE and Skymark II also executed a document entitled "First Amendment to Mortgage" ("Amended Mortgage") on January 25, 2017, under which they granted GreenLake a mortgage on all of their "right, title, and interest" in the real property they owned (Towers 100-400) to secure their obligations under the Amended Promissory Note.[36]  Skymark II and SPE signed the Amended Mortgage by its sole member SPC.  Katebian signed on behalf of SPC as its "Authorized Agent."[37]

The Amended Mortgage was recorded with the Oakland County Register of Deeds on February 21, 2017.[38]

---

[33]  *See* Amended Promissory Note (Ex. 2 to Docket # 55-2 in Case No. 19-40211) at pdf. p. 1 ¶¶ D, F, 1.

[34]  *Id.* at pdf. p. 1 ¶ 1.

[35]  *Id*. at pdf. pp. 7, 9, 11, 13.

[36]  *See* Amended Mortgage (Ex. C to Docket # 72-3 in Case No. 19-40248) at pdf. p. 3 ¶¶ 1-4.

[37]  *Id.* at pdf. pp. 5-6.

[38]  *Id.* at pdf. p. 2.

Both the Mortgage and the Amended Mortgage contained a scrivener's error in the legal description of the real property located at 27300 West Eleven Mile Road Southfield, MI (Tower 300), because it was based on the tax description for that property, which was erroneous. First American Title Insurance Company issued a title commitment for the property owned by SPE and located at 27100, 27200, and 27300 West Eleven Mile Road Southfield, Michigan with the erroneous legal description for 27300. The City of Southfield has since corrected the error in the tax description of the 27300 property.[39]

## C. The 2018 state court lawsuit against SPE, and the appointment of the Receiver

On March 12, 2018, one of the tenants of Tower 100 - Stefanini, filed a lawsuit against SPE in the Oakland County Circuit Court, (Case No. 2018-164324-CB, the "2018 State Court Lawsuit"), alleging certain defaults by SPE under a lease between Stefanini and SPE dated July 21, 2016 as amended on March 29, 2017 (the "Lease").[40] On July 30, 2018, Stefanini filed an emergency motion for the appointment of a receiver (the "Receivership Motion"). On August 22, 2018, the state court entered an order entitled "Stipulation and Order to Resolve Certain Issues" (the "August 22, 2018 Order"), which in relevant part, required SPE to (1) begin work on remodeling the lobby and the restrooms of the first floor (the "Lobby Buildout") "on or before August 20, 2018" and to "diligently complete the required [Lobby B]uildout under Section 15.01 [of the Lease];" (2) "strictly comply with its further obligations under the Court's July 31, 2018

---

[39] *See* Exs. A-D of "Receiver's Supplement Regarding Joint Dismissal Motion" (Docket # 67 in Case No. 19-40211).

[40] A copy of the state court docket for that case is attached as Exhibit A to Docket # 75-1 in Case No. 19-40211. A copy of the Lease is at Docket # 32-1 in Case No. 19-40248 at pdf. pp. 38-72, 78-90.

14

Order regarding DTE," and to pay to DTE $367,245 on September 4, 2018; and (3) "pay its debt

service to its lender (including real property taxes reserves) and maintain all utility service to the

property [located at] . . . 27100-27300 West 11 Mile Road, Southfield, Michigan" and . . . pay

Drobot Custom Building, Inc. ("Drobot") and Johnson Control Incorporated ("JCI") the unpaid

balances owed to each person within thirty (30) days of this Order."[41]  With regard to the pending

Receivership Motion, the August 22, 2018 Order stated:

> 4. The hearing on [the Receivership Motion] is adjourned
> without date.  However, once the Lobby Buildout is completed in
> Paragraph 1, DTE is paid as required by Paragraph 2 and Drobot
> and JCI are paid under Paragraph 3, [Stefanini] shall immediately
> withdraw [the Receivership Motion] without prejudice and shall
> confirm that it has done so in writing to [SPE's] counsel.
> Notwithstanding the foregoing, Stefanini shall be entitled to seek
> all rights or remedies available under the Lease or applicable law
> relating to any future or unknown events, occurrence, actions
> and/or omissions by [SPE].[42]

.

Later, on September 26, 2018, after holding "emergency hearings on July 30, 2018 and

August 10, 2018 [and] . . . adjourned hearings on August 16, 2018, September 12, 2018 and

September 26, 2018," the state court "found that [SPE] has violated (a) the terms of the [L]ease

between the [Stefanini] and [SPE] and (b) various Orders of this Court in this case;" and that

good cause existed for the appointment of a receiver.  The state court granted the Receivership

Motion, and entered an order appointing the Receiver (the "Receiver Order").[43]  Under the

Receiver Order the Receiver was authorized "to take possession, custody, and control of [SPE's

---

[41]  August 22, 2018 Order (attached as Ex. I to Docket # 32-2 in Case No. 19-40248) at pdf. pp.
26-27 ¶¶ 1-3.

[42]  *Id.* at pdf. p. 28 ¶ 4.

[43]  *See* Receiver Order (Ex. J. to Docket # 32-2 in Case No. 19-40248) at pdf. p. 31.

15

real property at Towers 100, 200, and 300] (the 'Property')[.]"[44]  The Receiver Order authorized

the Receiver "to take immediate possession and full control of" all of SPE's property — *i.e.*, the

following property which was defined as "Receivership Property:"

> 1.      The Property, and all tangible and intangible
> property used or useable in connection with the operation of the
> Property, including, without limitation, insurance premium
> refunds, insurance proceeds, condemnation awards, utility deposits
> and deposits of every other kind related to the Property causes of
> actions;

> 2.      All cash, cash on hand, checks, cash equivalents,
> deposit accounts, bank accounts, cash management or other
> financial accounts, bank or other bank deposits and all other cash
> collateral (all wether now existing or later arising), all current and
> past-due earning, revenues, rents, accounts, accounts receivables,
> CAM charges, issues and profits (all whether unpaid accrued, due,
> or to become due), **all claims to rent**, cash collateral, lease
> termination or rejection claim, any and all tax refund proceeds
> from tax appeals (whether now existing or later arising), insurance
> premium refunds or proceeds, and all other gross income derived
> with respect to the Property or business operations at the Property,
> regardless of whether earned before or after the entry of this Order,
> wherever located and from whomever may have possession )
> collectively, "Income");

> 3.      The leasehold obligations relating to current tenants
> of the Receivership Property, Federal-Mogul LLC (f/k/a Federal-
> Mogul Corporation) and its related entities (collectively, "Federal-
> Mogul") and Stefanini, Inc. ("Stefanini" and collectively with
> Federal-Mogul, the "Tenants") and any future tenants of the
> Receivership Property, if applicable, and **the Tenants shall make
> rental payments, as required, directly to the Receiver**, and shall
> not be required to make additional or duplicate payments as
> provided or required under the respective leases to any third partes
> including to [SPE] unless the Court orders otherwise;

> 4.      All fixtures trade fixture and tenant improvements
> of every kind or nature located in or upon or attached to the

---

[44] *Id.*

Property.

> 5.      All permits, licenses, other contracts or other intangible property pertaining the Property and the operation of the Property;

> 6.      All trade names and trademarks owned or used by [SPE] or its agents, representatives, or affiliates in connection with the Property;

> 7.      All books, records, accounts and documents that in any way relate to the Property or Income; and

> 8.      All other property, estate, right, title an interest of [SPE] relating to the Property.[45]

The Receiver was given broad powers and authority over the Receivership Property, including the authority "**to collect and receive all rents**, accounts receivable, revenues, profits and Income derived from the Property."[46]   The Receiver Order also granted the Receiver the authority

> [t]o determine and report to the Court and [Stefanini], and the Tenants as to whether any Income received by [SPE] relating to the Property since July 21, [2016] has been used for purposes other than paying debt service and other expenses relating to the Receivership Property, including making a determination as to whether money that has been paid to [SPE] . . . has been diverted or paid to any other entity related to or affiliated with the owners, members, parties, or equity interest holders of [SPE.][47]

Stefanini did not name GreenLake as a party to the 2018 State Court Lawsuit.  GreenLake filed a motion to intervene, and a motion for relief from the Receiver Order.  The state court

---

[45] *Id*. at pdf. pp. 32-33 (emphasis added).

[46] *Id.* at pdf. pp. 34-35 (emphasis added).

[47] *Id.* at pdf. p. 35 ¶ 12.

granted GreenLake's motion to intervene, but denied its motion for relief from the Receiver Order.[48]

After his appointment, the Receiver created a report summarizing of some of the deficiencies it found in Towers 100-300 (the "Receiver Report").[49] The report was made after conversations the Receiver had with the tenant Stefanini and references complaints made by Stefanini about certain violations of its lease with SPE. The Receiver Report detailed the conditions which impacted tenants Stefanini and Federal-Mogul. It stated, in relevant part:

> Tower 100:
>
> There are several deficiencies in Tower 100 concerning the elevators, HVAC systems, and roof leaks, among other concerns, all detailed below. There are also several violations to the Stefanini lease detailed below.
>
> The elevators in Tower 100 parking deck are completely inoperable. One elevator is boarded up completely. In talking with the facility manager at Stefanini, there has been an ongoing water issue with the roof of the walk way between the building and the parking deck that has allowed water to run down to the elevator pits. . . . Tenant expressed that when the elevators would go down in the building in the past that the owner was non-responsive and per the lease (Section 8.05) there are [to] be two elevators operational 24/7. . . .
>
> The HVAC equipment has been an issue for Stefanini, the existing tenant in the building. They have not had heat dating back to last winter and were told several pipes burst last year on the vacant floors. In walking the vacant floors, it was observed that much of the baseboard piping is broken, some beyond repair, and needing immediate replacement. . . .

---

[48]  *See* docket of the 2018 State Court Lawsuit (Ex. A to Docket # 75-1 in Case No. 19-40211); Stefanini's "Motion for Relief From September 26, 2018 Order Appointing Receiver" (Ex. 9 to Docket # 55-11 in Case No. 19-40211).

[49]  *See* Ex. K to Docket # 32-2 in Case No. 19-40248 at pdf. pp. 53-57.

During rain storms the roof to the walkway would leak. In addition, the broken drain pipe was causing water to pour into the parking deck. This would make the entrance to the parking deck and walkway a slip hazard for the tenant. Stefanini has minor leaks on their 7th floor from the roof that have not been addressed. . . .

The parking deck security system is inoperable. The gates to the parking deck were removed since it would not open. The cameras are inoperable in the parking deck as well. Since the elevators do not work, the parking deck is not ADA compliant.

There are several cracked/broken windows throughout the property. On the 3rd floor there is a clearly broken window that has not been fixed or boarded up. . . .

Per the Stefanini lease, ownership is to provide a lobby to the standards for the 3rd floor lobby. The lobby has not been completed. There are no ceiling tiles, no flooring, or bathrooms. Most of the 1st floor has been gutted but very little has been started. Mold was found on the wallcovering, peeled back from the wall. There is an ongoing leak in what was the men's restroom that was not addressed but a trash can was put in place to catch water. . . . The heating units put in place in the corridor on the 1st floor do not work according to the facility manager at Stefanini. In addition, because the tenant cannot get a Certificate of Occupancy, a 24/7 fire watch is in place.

Per the lease for Stefanini (Section 8.09 of the Lease) and Federal Mogul, 24/7 security is to be provided. This was not in place upon arrival to the property but the receiver has [contacted] the service and security guards are not monitoring the property.

Per the Stefanini lease, janitorial service was to be provided by ownership. Janitorial companies have turned over many times due to lack of payment. Stefanini currently contracts their own janitorial service for their space. . . .

There are two generators at the property, one is rented (payment status unknown) and does not have the capacity to service Federal Mogul and Stefanini. The original generator was removed because it was inoperable and replaced with a smaller one knowing that it would need to be upgraded if another tenant moved in besides

19

Federal Mogul. Per Stefanini lease, owner is to provide back-up generator service (Section 8.10). With respect to the generator, the fuel tanks are half full and to everyone's knowledge the fuel is long overdue for testing. . . .

Stefanini's facility manager mentioned that there is condensation in the stairwells. . . .

There are outstanding balances with DTE for Tower 100 and Tower 300 and shut off notices were issued. . . .

Tax Parcel 76-24-18-351-018 — 2018 taxes and water currently due equate to $120,763.63. Of this balance due, $56,966.55 is for water. The total balance due for this tower is inclusive of late fees and interest thru October 31, 2018.[50]

According to the Receiver Report, the Receiver has made progress in addressing these deficiencies in Tower 100. The actions that the Receiver has taken include the following.

[The Receiver] has identified the leak [in the roof of the walk way between the building and the parking deck] and have repaired the roof and a broken drain pipe to stop the water from flowing into the parking deck. . . . Receiver is working with an elevator contractor to do a complete assessment on the elevators. . . .

[The Receiver's] HVAC contractor has been onsite welding pipes and working to get the boilers operational in this building. All HVAC, including chemical treatment, is currently being assessed for a full report.

. . . [The] Receiver's roofing contractor is assessing all roofs of the receivership property.

. . .

[The] Receiver has contacted a window company to board or

---

[50] *Id.* at pdf. pp. 54-55. The problem of outstanding balances owed to DTE Electric Company is also documented at Exhibit H to Docket # 32-2 in Case No. 19-40248. In a letter dated September 17, 2018, the Executive Director of Chase Customer service wrote to DTE Electric Company informing it regarding a check in the amount of $70,000 whose maker was "Skymark Foods Limited": " THE CHECK IS FRAUDULENT" and had been "returned unpaid." (Ex. H to Docket # 32-2 at pdf. pp. 20-23.)

20

replace window if window is in stock on site.

. . .

[The] Receiver is bidding out janitorial services for the property.

On October 25, 2018, the Receiver filed a motion for the state court to approve a budget that the Receiver attached to the motion. On November 8, 2018, the state court entered an order granting that motion and approving the Receiver's proposed budget, through December 31, 2018 (the "Budget Order").[51] The Budget Order stated:

> IT IS ORDERED that:
>
> 1. The Motion is granted and that certain budget attached as Exhibit B to the Motion is approved through December 31, 2018, as to all re[]ccuring expenses. Repair and maintenance items over $7,500 are subject to approval of . . . GreenLake . . . . If [GreenLake] does not approve the items, the Receiver may petition the court for approval. The Receiver shall file and obtain all permits necessary to complete the Stefanini [B]uildout. The proposed capital improvements of the fire panel and generators is subject to further review of [GreenLake] or court approval. Any objections of [GreenLake] to the Stefanini [B]uildout shall be filed on or before Nov. 26th 2018.[52]

On November 27, 2018, the state court entered a stipulated order which amended the Budget Order and the Receiver Order.[53] The Receiver, GreenLake, and Federal-Mogul all consented to the entry of the order. That order eliminated the language in the Receiver Order that permitted GreenLake to take "any other action permitted under the [L]oan [D]ocuments or

---

[51] *See* "Order Approving Budget Through December 31, 2018" (attached as Ex. D to Docket # 59-1 in Case No. 19-40211) at pdf. p. 50-52.

[52] *Id.* at pdf. p. 52.

[53] *See* "Stipulated Order Regarding Budget and Amending Order Appointing Receiver" (Ex. E to Docket # 59-1 in Case No. 19-40211) at pdf. p. 53-56.

applicable law," and added language that permitted the Receiver's expenditures under the Budget in the Budget Order to be "within 10% of any line item but [with] no change to the overall amount . . . except for material property damage or health/safety issues, and the timing of such does not allow the Receiver to seek Court approval, which the Receiver shall promptly seek."[54] The order also revised how "Income" under the Receiver Order was to be applied. In this regard, it stated:

> 3.      Section VII of the Receiver Order is amended and replaced in full as follows:
>
> Income shall be applied as follows:
>
> 1.      First, to incurred but unpaid fees and expenses as provided for in the Budget.
>
> 2.      Next, to the creditors in accordance with priorities under Michigan law.
>
> 3.      Finally, any surplus to be held pending further order of the Court.[55]

On December 19, 2018, the state court entered an order, which stated, in pertinent part:

> It is hereby ordered that [SPE] shall produce by January 15, 2019 books and records in its possession, custody, or control that evidence payments made to DTE for July 21, 2016 to present.
>
> It is further ordered that the Receiver shall supplement his report based on the information provided by [SPE].
>
> It is further ordered that [SPE] shall pay DTE $418,650.49 in 8 equal monthly installments of $52,331.31 each.

---

[54]  *Id.* at pdf. p. 55.

[55]  *Id.* at pdf. pp. 55-56.

It is further ordered that [SPE] shall replenish funds in its firm's IOLTA Account within 30 day[s] of payment to DTE, so that $100,000 is maintained in the account until [SPE's] obligations to DTE under the Order are sati[s]fied.[56]

## D. The assignment of the Mortgage Loan Documents to the Lender

On December 18, 2018, the Lender was assigned all of the right title and interest GreenLake had in all of the Loan Documents.[57] This included the Promissory Note, the Amended Promissory Note, the Mortgage, and the Amended Mortgage.

## E. The notice of default and acceleration of the entire debt owed by Debtors

On December 24, 2018, the Lender provided a written notice to SPE, Skymark II, L&Y, SPC, Katebian, and John Premo, Esq. of Kickham Hanley PLLC, of default by SPE and Skymark II under the terms of the Loan Documents and of the acceleration of the total debt SPE and Skymark II owed under the Loan Documents (the "Acceleration Notice"). The Acceleration Notice stated that the defaults included, but were not limited to:

    A.    Borrower's failure to make payments as required under the terms of the Loan Documents from October 1, 2018 to the present;

    B.    The appointment of a Receiver in that certain action entitled: *Stefanini, Inc. v Skymark Properties SPE LLC, et al*, State of Michigan, Oakland County Circuit Court

---

[56] Ex. 4 to Docket # 55-5 in Case No. 19-40211.

[57] This was done by the Lender, on December 18, 2018, entering into an agreement with GreenLake entitled "Assignment of Mortgage Loan Documents (*see* Ex. E to Docket # 72-5 in Case No. 19-40248), and by the Lender entering into an "Assignment and Assumption Agreement" with Premier Equities, Inc. ("Premier"). Premier had previously, on November 16, 2018, entered into a Loan Purchase Agreement with GreenLake under which it had purchased loan documents described in that agreement from GreenLake. (*See* Ex. E to Docket # 72-5 in Case No. 19-40248; Ex. F to Docket # 72-7 in Case No. 19-40248 (Aff. of Scott Shefman) at ¶¶ 2-3. Scott Shefman is the authorized representative of the Lender. (Aff. of Scott Shefman at ¶ 1.)

23

Case No. 2018-164324-CB (the "Receivership Action"); and

    C.    Unapproved transfer of ownership interests in Borrower on or about July 14, 2017.[58]

The Acceleration Notice stated that "[b]ecause of the above defaults, and other occurring and continuing defaults, the Lender has elected to accelerate the maturity of the Loan and to declare the entire Loan balance to be immediately due and payable."[59] The Acceleration Notice stated further that "[d]ue to the Borrower's default, and occurring and continuing other defaults, the interest rate under the Loan increased to the Default Rate" and that "[t]he Loan now bears interest at the interest rate of "25% per annum effective as of December 31, 2016[.]"[60] The Acceleration Notice calculated the amount outstanding on the Loan as follows:

| | |
|---|---:|
| Principal: | $17,700,000.00 |
| Interest (10/2018-12/2018): | 486,750.00 |
| Default Interest (12/30/2016-12/30/2018): | 5,024,833.33 |
| Unpaid Monthly Tax Impound (l0/2016-12/2018): | 107,100.00 |
| Insurance Premiums: | 36,733.25 |
| Late Charges: | 1,818,675.00 |
| **Total:** | **$25,174,091.58** |

plus all interest accruing after that date, any prepayment premiums or yield maintenance payment as provided for in the [Promissory] Note, and all costs, expenses and attorneys' fees incurred by Lender, and less any amounts held by

---

[58] Ex. G to Docket # 72-7 in Case No. 19-40248 at pdf. p.3.

[59] *Id.* at pdf. p. 4.

[60] *Id.*

Lender in escrow reserve accounts, if any.[61]

The Acceleration Notice demanded that the Borrower "pay the Lender **$25,174,091.58** on or before January 4, 2019 at 2:00 p.m. local time."[62]

The Acceleration Notice provided in relevant part, that due to the Borrower's default, the Lender was entitled to the rental income from Towers 100-300. It stated:

> Due to the Borrower's defaults, [the] Lender is now entitled to rents and other income ("**Rental Income**") derived from the Mortgaged Property under the leases pursuant to the Mortgage, Assignment of Rents and other Loan Documents. Any license previously granted to Borrower to collect Rental Income was immediately revoked upon your initial default under the Loan documents, without notice, and this Rental Income must be immediately turned over to the Lender. Demand is made that you immediately deliver all such Rental Income to the Lender. Demand is made that you immediately deliver all such Rental Income to the Lender, in the form received by you to the Lender at the address provided above. Nothing in the foregoing is intended to modify any of the rights granted to the Receiver in the Receivership Action.[63]

## F. The 2019 state court lawsuit

The Lender also filed a state court lawsuit against Skymark II in the Oakland County Circuit Court, based on Skymark II's defaults under the Loan Documents.[64] The various defaults by Skymark II included "the failure of [Skymark II] and Skymark SPE to pay the Indebtedness (as defined therein) and to preserve and protect the Mortgaged Property (as defined in the

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at pdf. p. 5 (**Rents**) (bold and underlining in original).

[64] *See* Ex. F to Docket # 72-7 in Case No. 19-40248 (Aff. of Scott Shefman) at pdf. p. 4 ¶¶ 7-8.

25

Mortgages) and to maintain the Mortgaged Property in good condition and repair, all of which constitute an Event of Default (as defined in the Mortgages)."[65]  The Lender moved for the appointment of a receiver of Skymark II's property, including Tower 400, and a hearing on that motion was scheduled for January 7, 2019.

## G.  The Debtors' bankruptcy cases

On January 8, 2019, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing Case Nos. 19-40211 (for the Debtor Skymark II) and 19-40248 (for the Debtor SPE).  On January 28, 2019, the Court granted the Debtors' motion for joint administration of the Debtors' bankruptcy cases.[66]

The Debtor SPE filed its Cash Collateral Motion on January 22, 2019.  On January 28, 2019, the Lender, the Receiver, the Office of the United States Trustee, and the Debtors filed a stipulation for entry of an order entitled "Interim Order Authorizing Receiver's Use of Rents Under [§§] 543(c)(1) and (2)."[67]  The stipulating parties consented to a temporary order allowing the Receiver's continued collection and use of rents from the tenants of SPE's property.  The Court entered the stipulated order on January 28, 2019.[68]  That Order authorized the Receiver's collection and use of rental income from tenants of Towers 100-300, "for the specific purposes stated in the Budget attached to the Stipulation,. . .  and only under the terms and conditions set

---

[65]  *Id.* at 4.

[66]  *See* Docket ## 38, 68 in Case No. 19-40248.

[67]  Docket # 46 in Case No. 19-40211.

[68]  Docket # 47 in Case No. 19-40211.

26

forth in th[e] Order."[69]   This authority to collect and use the rents expires when the Court enters a final order ruling on the merits of the Cash Collateral Motion and the Dismissal Motion, or 90 days after the petition date, whichever is earlier.[70]

## IV.  Discussion of the Cash Collateral Motion

The Cash Collateral Motion seeks an order permitting SPE to use, as "cash collateral," the rental income derived from leases of space in Towers 100, 200, and 300.  The Lender filed an objection to the Cash Collateral Motion (Docket # 72, the "Lender's Objection").

## A.  The assignment of rents issue

The Lender objects to the Cash Collateral Motion on several grounds.  First and foremost, the Lender argues that there is no "cash collateral" that either Debtor can use in these cases.  In the case of Skymark II, it is undisputed that the Debtor has no income and no property that currently can be considered cash collateral.  The real estate owned by that Debtor, referred to by the parties as Tower 400, is vacant and is not generating any rental income or other income.  Nor is there any other asset that is, or that can become, cash collateral in that Debtor's case.

In the case of SPE, that Debtor's real estate, referred to by the parties as Towers 200, 300, and 300, does generate rental income, paid on a monthly basis by existing tenants.  SPE contends that such income, as well as the rental income that has been collected by the Receiver, is cash collateral that SPE can use, if it provides adequate protection in the form proposed by the Cash Collateral Motion.

The Lender argues that none of the rental income is property of the bankruptcy estate, so

---

[69]  Docket # 47 at pdf. p. 3 ¶ K.

[70]  *Id.* at 4 ¶ 2.

none of it can be used by SPE as cash collateral. It is not property of the bankruptcy estate, according to the Lender, because of the assignment of rents granted to the Lender by SPE in the Mortgage. According to the Lender, because of that assignment of rents and because pre-petition, SPE defaulted under its Promissory Note and Mortgage, ownership of the rents belong to the Lender, and SPE has no ownership interest in rents. SPE disputes the Lender's argument.

The parties agree that the ownership of the rents is determined under Michigan law. And SPE agrees to this much: that when the mortgage contains an assignment of rents like the one in this case, the assignment of rents is effective to transfer ownership of the rents to the mortgage creditor, when the following five events have occurred: "(1) execution of assignment of rents; (2) recording of assignment of rents; (3) default under the mortgage; (4) recording of notice of default; and (5) service of recorded notice of default and instrument creating assignment of rents on tenants."[71] SPE concedes that where all five of these steps have occurred before the filing of a bankruptcy case, the bankruptcy debtor has no ownership interest in rents that can be considered property of the bankruptcy estate, and cannot use rents as cash collateral under 11 U.S.C. § 363(c)(2). All of this, and more, is now clear based on Michigan law. *See generally Town Ctr. Flats, LLC v. ECP Commerical II, LLC* (*In re Town Ctr. Flats, LLC*), 855 F.3d 721 (6th Cir. 2017), *cert. denied*, 138 S.Ct. 328 (2017); Mich. Comp. Laws Ann. §§ 554.231, 554.232.

The Lender goes further than SPE, and argues that under Michigan law, a transfer of ownership of the rents to a mortgage creditor occurs as soon as steps 1-3 above have occurred, even if steps 4 and 5 have not occurred. That is what happened in this case. As SPE's counsel

---

[71] Combined Br. in Response to Joint Dismissal Mot. (Docket # 55-1 in Case No. 19-40211) at 32 (citing Mich. Comp. Laws Ann. §§ 554.231, 554.232).

correctly admitted during the hearing, steps 1-3 above occurred before the filing of this bankruptcy case. It is undisputed that SPE executed the assignment of rents as part of its execution of the Mortgage, that the Mortgage and its assignment of rents were recorded, and that SPE defaulted under the Mortgage, all pre-petition. And the parties agree that steps 4 and 5 did not occur. That is, it is undisputed that there was no notice of default recorded, and that no notice of default was served upon the tenants. SPE argues that because these steps did not occur, SPE retains its ownership interest in the rents, subject to a security interest in favor of the Lender, and that SPE's interest in the rents is property of the bankruptcy estate, which may be used as cash collateral.

The Court agrees with the Lender on this issue, and concludes that the occurrence of steps 1-3 is sufficient to transfer ownership of the rents to the mortgage creditor under Michigan law, without the occurrence of steps 4 and 5. Steps 4 and 5 are necessary only to place the tenants on notice of the requirement to pay rent to the mortgage creditor instead of SPE, and to bind the tenants to do so. But after steps 1-3 have occurred, any rent paid by the tenants to SPE are the property of the Lender, not SPE, and SPE merely holds those rents it receives as property of the Lender.

Support for these conclusions is found in the wording of the relevant Michigan statutes, and the case law construing such statues, including the most recent decisions of the Michigan Court of Appeals, and the recent decision of the United States Court of Appeals for the Sixth Circuit in the *Town Center Flats* case, cited above.

First, the relevant Michigan statutes clearly draw a distinction between the events that must occur in order to deem the assignment of rents binding and effective against the

29

debtor/mortgagor (also referred to in the statutes as the "assignor"), on the one hand, and the

further events that must occur for such assignment to be binding and effective against the

debtor's tenants.  The two statutes are Mich. Comp. Laws Ann. §§ 554.231 and 554.232.  Section

554.231 states:

> Sec. 1. Hereafter, in or in connection with any mortgage on commercial or industrial property other than an apartment building with less than 6 apartments or any family residence to secure notes, bonds or other fixed obligations, it shall be lawful to assign the rents, or any portion thereof, under any oral or written leases upon the mortgaged property to the mortgagee, as security in addition to the property described in such mortgage. **Such assignment of rents shall be binding upon such assignor only in the event of default in the terms and conditions of said mortgage, and shall operate against and be binding upon the occupiers of the premises from the date of filing by the mortgagee in the office of the register of deeds for the county in which the property is located of a notice of default in the terms and conditions of the mortgage and service of a copy of such notice upon the occupiers of the mortgaged premises.**

*Id*. (emphasis added).  Section 554.232 states:

> Sec. 2. **The assignment of rents, when so made, shall be a good and valid assignment of the rents** to accrue under any lease or leases in existence or coming into existence during the period the mortgage is in effect, **against the mortgagor or mortgagors or those claiming under or through them from the date of the recording of such mortgage, and shall be binding upon the tenant under the lease or leases upon service of a copy of the instrument under which the assignment is made, together with notice of default as required by section 1.**

*Id*. (emphasis added) (footnote omitted).

The most recent Michigan appellate decisions on this issue hold that the transfer of

ownership in rents from the assignor/mortgagee to the creditor/mortgagor occurs as soon as steps

1-3 listed above have occurred, even in the absence of steps 4 and 5 occurring.  *Otis Elevator Co.*

*v. Mid-America Realty Investors*, 522 N.W.2d 732, 733, 734 (Mich. Ct. App. 1994); *Bioresource,*

*Inc. v. City of Detroit*, No. 288263, 2010 WL 935647, at *4 (Mich. Ct. App. March 16, 2010)

(per curiam); *TGINN Jets, L.L.C. v. Hampton Ridge Properties, L.L.C.*, Nos. 294622, 297844,

2013 WL 4609208, at *19 (Mich. Ct. App. Aug. 29, 2013) (per curiam).[72]

*Otis Elevator* was a garnishment action by a judgment creditor who sought to obtain the

rental payments of the tenants of a building owned by the judgment debtor.  But the judgment

debtor had granted a mortgage to its lender, with an assignment of rents.  The mortgage had been

recorded, and the debtor had defaulted, all before the judgment creditor began its garnishment

action.  It was only a month *after* the garnishment action began that the mortgage creditor served

---

[72]  Of these three cases, *Otis Elevator* is a published decision, and therefore "has precedential
effect under the rule of stare decisis." Mich. Ct. R. 7.215(C)(2).  *Bioresource* and *TGINN Jets* are
unpublished decisions.  Under applicable rules, they may be cited as persuasive authority.  As this Court
has explained:

> Under Mich. Ct. R. 7.215(C)(1) "[a]n unpublished opinion is not
> precedentially binding under the rule of stare decisis."  However,
> Michigan courts may consider unpublished opinions as persuasive
> authority.  *See, e.g., People v. Green*, 680 N.W.2d 477, 484 n.5 (Mich.
> Ct. App. 2004)("Although unpublished opinions are not binding
> precedent, [Mich. Ct. R.] 7.215(C)(1), we utilize it as a guide and view it
> as persuasive in light of the limited case law in this area."); *Cedroni
> Assocs., Inc. v. Tomblinson, Harburn Assocs.,* 802 N.W.2d 682, 709 &
> n.5 (Mich. Ct. App. 2010) (Kelly, J., dissenting) (viewing a per curiam
> unpublished opinion of the Michigan Court of Appeals as "[m]ore
> persuasive and on point" than a published opinion relied on by the
> majority).

*McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 788 n. 19 (Bankr. E.D. Mich. 2011); *see also Wells v.
THB America, LLC* (*In re Clements Mfg. Liquidation Co., LLC*), 486 B.R. 400, 403 n. 8 (Bankr. E.D.
Mich. 2012) (unpublished Michigan Court of Appeals decisions may be cited as persuasive authority);
*Paris Meadows, LLC v. City of Kentwood*, 783 N.W.2d 133, 139 n. 3 (Mich. Ct. App. 2010) (quoting
Mich. Envtl. Council & Pub. Interest Research Grp. in Mich. v. Mich. Pub. Serv. Comm'n. (*In re
Application of Ind. Mich. Power Co.*)*,* 738 N.W.2d 289 (Mich. Ct. App. 2007)) (unpublished opinions of
the Michigan Court of Appeals may be "considered instructive or persuasive"); *Cox v. Hartman*, 911
N.W.2d 219, 228 (Mich. Ct. App. 2017) (same).

31

the tenants of the building with a notice of default and a copy of the mortgage agreement.  522

N.W.2d at 732-733.  The Michigan Court of Appeals held that the debtor no longer had an

interest in the rents *from the time of its default* under the mortgage, so that the rents could not be

garnished.  The court stated:

> [The judgment creditor] argues that in order to avail itself of the
> rent assignment provision in the mortgage, [the mortgage holder]
> was required to serve the building tenants with notice of default in
> the mortgage as required by [Mich. Comp. Laws §] 554.231;
> M.S.A.  25.1137(1). In response, [the mortgage holder] argues that
> once it recorded the mortgage and the mortgagor's default, the
> assignment of rents was valid and enforceable as between the
> mortgagor ([the debtor]) and mortgagee.  . . .  **Thus, [the
> mortgage holder] contends that [the judgment creditor] could
> not garnish the rents because [the debtor] no longer had an
> interest in the rents. We agree with the position of [the
> mortgage holder].**
>
> . . .
>
> Notably, the statutory language [of Mich. Comp. Laws §] 554.231
> states that such an "assignment of rents shall be binding upon such
> assignor only in the event of default . . . ."  **Thus, the mortgagor's
> default is sufficient to finalize the mortgagee's interest in the
> rents as against the mortgagor. The additional language
> requiring service of notice of default upon the "occupiers" or
> tenants concerns the operation of the assignment as against the
> tenants, not as against the assignor.**

*Id*. at 733 (emphasis added).

In the *Bioresource* case, decided in 2010, the Michigan Court of Appeals again held that

an assignment of rents is effective to give the mortgage creditor ownership of the rents when

steps 1-3 have occurred, and that steps 4 and 5 are not necessary to obtain this result.  The court

followed its earlier decision in *Otis Elevator* in reaching this result:

> Here, although Paragraph 16 of the mortgage agreement required
> the mortgagor to assign leases to the mortgagee "[a]s additional

32

security" and permitted the mortgagee to collect rent in the event of default in accordance with [Mich. Comp. Laws §] 554.231, the city maintains that [the mortgagee's] failure to record and serve a notice of default on [the tenant] and the city was fatal to [the mortgagee's] claim for the [rent] under [Mich. Comp. Laws §] 554.231. **Such an argument, however, misapprehends the plain language of the statute.**

As *Otis Elevator Co. v. Mid–America Realty Investors*, 206 Mich.

App. 710, 713-714, 522 N.W.2d 732 (1994), explains:

> Notably, the statutory language states that such an "assignment of rents shall be binding upon such assignor only in the event of default . . . ." Thus, the mortgagor's default is sufficient to finalize the mortgagee's interest in the rents as against the mortgagor. The additional language requiring service of notice of default upon the "occupiers" or tenants concerns the operation of the assignment as against the tenants, not as against the assignor.

Consequently, **under the plain language of the statute, the assignment of rent to [the mortgagee] became binding upon [the] default on the mortgage. Thus, [the mortgagor's] right to the rent was not contingent upon the filing or service of default.** *Id.* Rather, **the filing and service provision of [Mich. Comp. Laws §] 554.231 merely serves to protect the tenant with respect to whether rent is owed to the mortgagor or mortgagee and "'does not affect the rights between mortgagor and mortgagee.'"** *Id.* at 714, 522 N.W.2d 732.

*Bioresource,* 2010 WL 935647, at *4 (emphasis added) (citation omitted).[73]

---

[73] In addition to citing the *Otis Elevator* case, the court in *Bioresource* also noted the 1985 bankruptcy court case of *In re P.M.G. Properties*, 55 B.R. 864 (Bankr. E.D. Mich. 1985). *Bioresource,* 2010 WL 935647, at *2. The *P.M.G.* case interpreted and applied the Michigan statutes at issue, [Mich. Comp. Laws] §§ 554.231 and 554.232, to mean that "a mortgagor's interest in rents made subject to an assignment of rents pursuant to [the statutes] is automatically terminated upon default by the mortgagor." *P.M.G.*, 55 B.R. at 870. The *P.M.G.* court held that this result does not require steps 4-5, and held that "[t]he requirement that the mortgagee file a notice upon the occupiers serves the . . . purpose . . . to protect the occupiers of the premises. This requirement does not condition the right of the mortgagee against the mortgagor." *Id.*

33

In the *TGINN Jets* case, decided in 2013, the Michigan Court of Appeals also held that only steps 1-3 must occur in order to entitle the mortgagor to the rents under an assignment of rents:

> Plaintiffs argue that, even if a default event occurred, [the mortgage creditor] did not have a superior right to the rents because it failed to record notice of the default with the register of deeds and serve such notice on [the tenant]. We disagree. [Mich. Comp. Laws §] 554.231 provides that an assignment of rent "shall operate against and be binding upon the occupiers of the premises from the date of filing by the mortgagee in the office of the register of deeds . . . of a notice of default . . . and service of a copy of such notice upon the occupiers of the mortgaged premises." **This provision is concerned with the operation of the assignment against the tenant, not the assignor of the rents.** *Otis Elevator Co*, 206 Mich. [Ct.] App[.] at 714. Therefore, the trial court correctly determined that plaintiffs could not establish priority to the rents based on this portion of [Mich. Comp. Laws §] 554.213.

*TGINN Jets*, 2013 WL 4609208, at *19 (emphasis added).

More recently, in 2017, the United States Court of Appeals for the Sixth Circuit interpreted and applied the Michigan assignment of rents statutes in the *Town Center Flats* case, cited above. The precise issue before this Court was not presented or decided in *Town Center Flats*, because the mortgagor in that case met all five steps (steps 1-5). *See* 855 F.3d at 726 n.1. Nonetheless, the court of appeals repeatedly used language indicating that steps 1-3 are sufficient to transfer ownership of the rents to the mortgage creditor. For example, in its concluding section, the court stated: "Mich. Comp. Laws § 554.231 allows for transfers of ownership when an agreement to assign rents indicates an intention to do that, has been recorded, and default has occurred." 855 F.3d at 728. Earlier in its opinion, and citing, among other cases, the *Otis*

(citations omitted).

34

*Elevator* case, the court stated:

> Michigan courts generally discuss assignments of rents under
> § 554.231 as ownership transfers. . . . Once an assignee has: 1)
> entered into an agreement to assign rents; 2) recorded that
> agreement; and 3) default has occurred, then the assignee's rights
> "are perfected and binding against the assignor" and the assignor
> "no longer has [a] valid property interest in the rents." [*Otis
> Elevator Co.*, 522 N.W.2d at 734]. The assignor has the legal right
> to collect the rents directly from tenants once notice of the default
> has been filed in the county's register and served on the tenants.
> Mich. Comp. Laws §§ 554.231, 554.232. Michigan courts have
> generally treated the assignment of rents as a transfer of ownership
> once the agreement has been completed and recorded and a default
> has occurred. *See Otis Elevator*, 522 N.W.2d at 733 (stating "once
> [the assigner] recorded the mortgage and the mortgagor's default,
> the assignment of rents was valid and enforceable as between the
> mortgagor . . . and the mortgagee.") *Otis Elevator* implies that this
> should be regarded as a transfer of all rights in the rents. 522
> N.W.2d at 733 (finding that the assignor "no longer has an interest
> in the rents.").

855 F.3d at 725-26.

Later, in a 2018 case, the Sixth Circuit quoted with approval from the language above in

*Town Center Flats*, and reiterated that "the assignment of rents effectuate[s] a transfer of

ownership upon default under Michigan law." *WBCMT 2003-C9 Island Living, LLC v. Swan

Creek Ltd. P'ship*, 738 Fed. App'x. 833, 837-38 (6th Cir. 2018).

As noted in footnote 73 above, an older bankruptcy court case from this district held in

1985 that under the Michigan assignment of rents statutes, the occurrence of steps 1-3 is

sufficient to transfer ownership of rents to the mortgagee, even without the occurrence of steps 4

and 5. *In re P.M.G. Properties*, 55 B.R. at 870. But that view was not unanimous among the

older bankruptcy cases. SPE cites two older bankruptcy cases that it says supports its view, that

all five steps are necessary before a mortgagor obtains ownership of rents under an assignment of

rents: *In re Mt. Pleasant Ltd. P'ship*, 144 B.R. 727, 734 (Bankr. W.D. Mich. 1992) and *In re Coventry Commons Assocs.*, 143 B.R. 837 (E.D. Mich. 1992).

The *Mt. Pleasant*, case does support SPE's position, but the *Coventry Commons* case does not. In *Mt. Pleasant*, the bankruptcy court discussed an assignment of rents under Michigan law, and held that when steps 1-3 have occurred, but steps 4 and 5 have not, "the debtor has at least the bald legal right to collect the rent," and therefore has a right to use the rents as cash collateral, provided that "there is adequate protection of the creditor's interest[.]" *See* 144 B.R. at 734. That case also held that where steps 1-5 all have been completed, "the debtor has lost the legal right to collect the rents[, and t]herefore, the rents cease to be property of the [bankruptcy] estate." *Id.*

*Coventry Commons* does not support SPE's argument that all five steps must occur before ownership of the rents transfers to the mortgagee. *Coventry Commons* held that steps 1-3 were sufficient to give the mortgagee a perfected present *security interest* in the rents, and that steps 4 and 5 were not necessary "when the [mortgagee] seeks to enforce an assignment of rents against the assignor only," as opposed to enforcing it against the tenants. 143 B.R. at 838. *Coventry Commons* did not hold that completion of steps 1-3, or even of steps 1-5, caused *a transfer of ownership* of the rents to the mortgagee. That issue apparently was not argued by the parties in *Coventry Commons*. But the later cases discussed above, such as *Otis Elevator* and *Town Center Flats*, held that there is an actual transfer of ownership of the rents to the mortgagee.[74] *Coventry*

---

[74] In addition to the *Mt. Pleasant* case and the *Coventry Commons* case, a bankruptcy court decision from 1994 held that an assignment of rents merely gives the mortgagee a security interest in the rents, rather than absolute ownership. *See In re Newberry Square, Inc.*, 175 B.R. 910, 915 (Bankr. E.D. Mich. 1994). But that holding was rejected in later cases, including the Sixth Circuit's 2017 decision in *Town Center Flats*.

*Commons* does support this Court's distinction, discussed above, between the effect of steps 1-3 and the effect of steps 4 and 5. In that way, it undercuts SPE's argument.

As discussed above, it is true that the *Mt. Pleasant* case supports SPE's position. But to that extent, the Court respectfully disagrees with that case. *Mt. Pleasant* was decided before the three Michigan Court of Appeals cases discussed above, beginning with *Otis Elevator*. Based on those more recent Michigan appellate cases, as well as the Sixth Circuit's recent discussions of Michigan law on assignment of rents in *Town Center Flats* and *WBCMT 2003-C9 Island Living*, described above, this Court holds that under Michigan law, only steps 1-3 are necessary in order to transfer ownership of rents to the mortgagee under an assignment of rents provision like the one involved in this case.[75]

When steps 1-3 are completed, but steps 4 and 5 have not yet been completed, the tenants have a right to continue paying rent to the debtor, and have no duty to pay rent to the mortgage creditor. In that situation, however, rents paid to the debtor are, and remain, property of the mortgage creditor, and the debtor holds such rents as such. In a case like this one, where a

---

[75] The undersigned judge discussed an assignment of rents in *In re Madison Heights Grp., LLC*, 506 B.R. 728 (Bankr. E.D. Mich. 2013). In that case, this Court stated that steps 1-5 "are required in order for a creditor to obtain 'complete enforcement of an assignment of rents.'" 506 B.R. at 730 (citations omitted). For this proposition, the Court cited the *Mt. Pleasant* case and *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 358-59 (Bankr. S.D.N.Y. 1995) (a bankruptcy case in which all five steps had occurred pre-petition). But in *Madison Heights Grp., LLC* , this Court found that there was no dispute that steps 1-5 all had occurred pre-petition. *See Madison Heights Grp., LLC*, 506 B.R. 728, 730 (Bank. E.D. Mich. 2013); *see also In re Madison Heights Grp., LLC*, 506 B.R. 734, 737-39 (Bankr. E.D. Mich. 2014) (opinion denying motion for reconsideration). So in *Madison Heights*, this Court was not called upon to decide whether steps 1-3 alone were sufficient to transfer ownership of the rents under Michigan law.

To the extent this Court's language in *Madison Heights Grp., LLC* indicates that all five steps are necessary to transfer ownership of the rents to the mortgagee, rather than steps 1-3 being sufficient, the Court now retreats from such a position, based on *Otis Elevator* and the other Michigan appellate cases cited above.

receiver was appointed to collect the rents, the receiver holds the rents collected for the mortgagee, who owns the rents under the assignment of rents. *See WBCMT 203C9 Island Living, LLC v. Swan Creek Ltd. P'ship*, 738 Fed. App'x. 833, 838 (6th Cir. 2018). And the mortgagee's ownership of the rents extends to rents collected by the debtor or the receiver even before the debtor defaulted, as well as after default. *See 7800 W. Outer Road Holdings, L.L.C. v. College Park Partners, L.L.C.*, No. 303182, 2012 WL 2402010, at *4-5 (Mich. Ct. App. June 26, 2012) (per curiam).

**B. Other issues**

For the reasons described above, the Court concludes that there is no cash collateral that SPE can use in this case. The rental income from the SPE's tenants, and the right to receive that income, belongs entirely to the Lender, unless and until SPE fully pays its debt to the Lender, or redeems SPE's real estate after a foreclosure sale. The Cash Collateral Motion therefore must be denied.

SPE makes several other arguments in support of its Cash Collateral Motion, but none of those arguments changes the result just described.

**1. SPE's argument based on Bankruptcy Code § 552(b)**

SPE argues that for various reasons, the Lender's security interest in the rents should not be deemed to extend to rents paid by SPE's tenants after the commencement of the bankruptcy case, "based on the equities of the case," within the meaning of 11 U.S.C. § 552(b). This argument fails because the "equities of the case" exception, which is an exception to the general rule that pre-petition security interests extend to collateral acquired post-petition, applies only to the question of whether a creditor's "security interest" will extend to such post-petition acquired

38

property.  It does not apply to the Lender's *ownership* of rents that come due and that are paid by

SPE's tenants post-petition.  Because the Lender owns such post-petition rents, and SPE does

not, § 552(b) does not permit the Court to limit the Lender's ownership rights in the rents that are

paid post-petition.  Section 552 states:

> (a) Except as provided in subsection (b) of this section, **property acquired by the estate or by the debtor** after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, **then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case** to the extent provided by such security agreement and by applicable nonbankruptcy law, **except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.**

> (2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and **if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property** or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, **then such security interest extends to such rents** and such fees, charges, accounts, or other payments **acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.**

11 U.S.C. § 552 (emphasis added).

39

Based on the bolded language quoted above, § 552(a) does not apply here, because the rents are not property "acquired by the estate or by the debtor" after the commencement of the case. Sections 552(b)(1) and 552(b)(2) do not apply, because the issue is whether the Lender's *ownership* of the rents extends to post-petition rents. Sections 552(b)(1) and 552(b)(2) do not address that issue, and are limited in application to rents acquired by "the estate" post-petition. Because the rents are not property of the estate, they are not acquired "by the estate." So these sections do not give the Court any authority to limit the Lender's *ownership rights* in the post-petition rents, based on the "equities of the case" or otherwise.

SPE has cited no contrary authority.

Even if the § 552(b) "equities of the case" exception could apply here, the Court would not exercise its discretion under that exception to limit the Lender's security interest or ownership interest in the rents acquired post-petition. The "equities of the case" would not justify such a limitation in this case. SPE's arguments about the "equities of the case" are not persuasive. SPE's equities arguments are (1) that the Lender has failed to provide SPE with a loan payoff statement, as requested by SPE's counsel on January 25, 2019, which SPE says is needed so it can continue to seek to refinance the Loan with another lender; and (2) that the Lender is charging a "criminally usurious interest rate" on its loan, in violation of Michigan law.

These arguments fail. First, at this point in time, the detailed Acceleration Notice that the Lender provided to the Debtors on December 24, 2018 is sufficient under the circumstances to inform the Debtors of the approximate amount currently needed to pay off the Loan, and the exact amount can easily be calculated and obtained from the Lender if and when SPE actually obtains approval of a refinancing loan from another lender. Second, the Court finds that the

Lender is not violating the Michigan usury statute, for the reasons discussed in subsection (d) below.

For these reasons, the Court finds that SPE would not be entitled to any relief any under § 552(b) based on the "equities of the case," even if that section could apply to the Lender's ownership interest of post-petition rents, which it does not.

### 2. The Lender's failure to file a U.C.C. financing statement in Delaware

SPE argues that because SPE is a Delaware limited liability company, the Lender had to file a U.C.C. financing statement in Delaware, the state of the Borrower's incorporation, citing 6 Del. C. § 9-307(e). A U.C.C. financing statement was filed in Michigan, but not in Delaware. SPE argues that the Lender's failure to file in Delaware means that the Lender is "not perfected in any of the Skymark Properties, SPE's personal property."[76]

In an argument SPE made only in the hearing, and not in its pre-hearing brief or other papers, SPE argues that all rents paid by SPE's tenants to the Receiver became SPE's personal property once they were paid to the Receiver, and held by the Receiver in the form of cash or a bank deposit. As such, the paid rents became collateral for which the Lender had to have filed a U.C.C. financing statement in Delaware. Thus, SPE argues, the Lender did not have a perfected security interest in the paid rents. From this, SPE argues that any claimed security interest or claim of ownership by the Lender in the rents that were paid to the Receiver is subject to challenge and avoidable.

SPE has not cited any authority in support of this argument, and the Court must reject it.

---

[76] Debtors' Combined Br. in Response to Joint Dismissal Mot. (Docket # 55-1 in Case No. 19-40211) at 30.

41

SPE does not dispute that the Lender has had at all times a perfected mortgage in SPE's real property and a perfected interest by virtue of the assignments of rents, by virtue of the recording in 2016 of the Lender's Mortgage. And, as this Court has discussed in Part IV.A of this opinion, the SPE's right to receive rents and the rents became the sole property of the Lender as soon as SPE defaulted under the Mortgage. The first default by SPE under the Mortgage occurred at least as early as the date on which the Receiver was appointed, on September 26, 2018. *See* Part III.B.1 of this opinion (appointment of a receiver is an Event of Default). This means that all rents that were paid to the Receiver by the tenants were property of the Lender, and the Receiver has been holding all such rents as property of the Lender. Because the rents paid to the Receiver at all times were property of the Lender, there was no need for the Lender to perfect a security interest in *SPE's personal property* — the paid rents were not SPE's property. For these reasons, SPE is simply wrong in asserting, without authority, that the Lender's security interest and assignment of rents became unperfected when the rents were paid by the tenants to the Receiver.

### 3. The alleged error in the legal description of SPE's property in the Mortgage

In their brief, the Debtors asserted that the Lender's "mortgage (and amendment) contains several errors in the legal description," as noted in "a draft title commitment policy from First American Title [Insurance Company] (Exhibit 8)." SPE then stated that the "Debtors reserve all rights to challenge the validity, priority, and extent of [the Lender's] lien on [the] Debtors' real properties. *See Vandenbosch v. Edlund* (*In re Vandenbosch*), 405 B.R. 253, 264 (Bankr. W.D. Mich. 2009)[.]"[77]

---

[77] Debtors' Combined Br. in Response to Joint Dismissal Mot. (Docket # 55-1 in Case No. 19-40211) at 31.

The Court construes this argument by SPE as nothing more than a reservation of rights to later challenge the validity, priority, and/or extent of the Lender's Mortgage lien, rather than a present challenge of any of those things. This is apparent from the wording of SPE's brief, quoted above, and from the fact that SPE failed to properly support or develop any argument about the validity of the Lender's Mortgage. SPE has failed to allege any specific facts about alleged error(s) in the Mortgage's legal description that could even arguably make the Lender's Mortgage invalid, or otherwise limit the scope of that Mortgage in any way, under Michigan law. In their brief, and during the hearing, SPE's counsel did not identify what the alleged errors in the Mortgage's legal description were, and in fact, said that he did not know what the alleged errors were. Nor did he present any sort of reasoned argument as to why any alleged error(s) affected the validity or extent, or the possible avoidability, of the Lender's Mortgage in any way under applicable law. The "Exhibit 8" cited in SPE's brief, a draft title commitment policy from First American Title [Insurance Company], merely stated, with respect to the Mortgage, the following "NOTE: Above document contains an error in the legal description."[78] During the hearing, the Court asked SPE's counsel what the error was in the legal description, and SPE's counsel stated that he did not know.

The factual and legal assertions and the argument made by SPE regarding any alleged error in the Mortgage's legal description clearly are insufficient to permit the Court to question the validity, priority, or extent of the Lender's Mortgage lien. And they are insufficient to negate the Court's conclusion, which the Court now makes, that the Lender has sufficiently demonstrated, for purposes of the Court's decision on the Cash Collateral Motion, the validity,

---

[78]  Docket # 55-10 (Ex. 8 at Docket # 55 in Case No. 19-40211) at "page 8 of 14," item 20.

priority, and extent of the Lender's Mortgage lien.  *See* 11 U.S.C. § 363(p)(2).[79]

## 4.  SPE's usury argument

SPE argues that the Lender is charging interest, including default interest, on its Loan that exceeds the maximum 25% rate permitted under the Michigan usury statute, Mich. Comp. Laws Ann. § 438.41.  Because of this, SPE argues, the Lender is barred from recovering any "interest, late fees, court costs or attorney fees," citing Mich. Comp. Laws Ann. § 438.32.[80]

The Lender is not in violation of Michigan's usury statute.  As the Lender correctly points out, the Promissory Note, at paragraph 18, contains a provision that necessarily means that the interest charged under the Promissory Note cannot exceed the maximum amount permitted by law.  That provision states:

> 18. Usury. It is the specific intent of the Borrower and Lender that this [Promissory] Note bear a lawful rate of interest, and if any court of competent jurisdiction should determine that the rate herein provided for exceeds that which is statutorily permitted for the type of transaction evidenced hereby, the interest rate shall be

---

[79]  During the hearing, the attorney for the Receiver stated that he had learned from American First Title [Insurance Company] that the only alleged error in the legal description in the Lender's Mortgage was in a metes-and-bounds description for one of the real estate parcels, where at one place, the description stated "East" when it should have stated "West."  The Receiver provided further details on this point in a supplement filed after the hearing.  (Receiver's Supplement Regarding Joint Dismissal Motion (Docket # 67 in Case No. 19-40211)).

Such an error in the legal description appears to be too trivial, and not of such a nature, to have any impact on the validity, priority, or extent of Lender's Mortgage in the Debtors' real property. *See, e.g., Fuhrman v. Wilmington Sav. Fund Soc'y, FSB* (*In re Fuhrman*), No. 17-21073-DOB, 2018 WL 6722365, at *3-4 (Bankr. E.D. Mich. Dec. 18, 2018) (granting summary judgment against a Chapter 13 debtor's claim seeking to avoid a mortgage because of an error in the metes-and-bounds legal description).  In this respect, this case is quite different from the *Vandenbosch* case, cited by SPE.  In that case, a mortgage was successfully avoided by a Chapter 7 Trustee because it only contained a legal description of an entirely different piece of property — "the vacant lot adjacent to the property, rather than the "Property itself."  *See Vandenbosch*, 405 B.R. at 264.

[80]  Debtors' Combined Br. in Response to Joint Dismissal Mot. (Docket # 55-1 in Case No. 19-40211) at 29-30.

> reduced to the highest rate permitted by applicable law, with any
> excess interest theretofore collected being applied against principal
> or, if such principal has been fully repaid, returned to Borrower on
> demand. More specifically, the calculation of Interest in this
> [Promissory] Note shall not exceed 25% when considering all fees
> or other costs which are interpreted as interest.[81]

Under the Promissory Note, by definition, the interest due under the Loan contract between the parties cannot exceed the maximum rate allowed by Michigan's usury statute.

Furthermore, even if the Loan was in violation of the Michigan usury statute, the Lender would still be entitled to recover repayment of the full principal amount of its Loan, under Mich. Comp. Laws Ann. § 438.32, which was $17.7 million as of December 30, 2018. *See Washburn v. Michailoff*, 613 N.W.2d 405, 410 (Mich. Ct. App. 2000) (citation omitted) ("[W]hen a lender seeks to enforce a usurious contract, the borrower is entitled to have any previously paid interest applied against the outstanding principal.). Because of such debt, the fact remains that the Lender owns the rents from SPE's real estate, which means that there is no "cash collateral" that SPE can use.

### 5. SPE's "net rents" argument

SPE argued during the hearing that even if the Lender did become the owner of the rents upon the SPE's default, that ownership only extends to the "net rents," meaning only the rents left over after the rents are first used to pay the reasonable expenses of maintaining and operating SPE's commercial office property. But SPE has cited no authority under Michigan law to support this argument, and the Court is not aware of any such authority. Rather, the statutes and cases discussed in Part IV.A of this opinion clearly indicate that the Lender obtained ownership

---

[81] Promissory Note (Ex. 1 to Docket # 55-2 in Case No. 19-40211) at pdf. p. 16 ¶ 18.

of all rents, not just the "net rents," under the assignment of rents.

## V.  Conclusion

For the reasons stated in this opinion, the Court must deny the Cash Collateral Motion.

The Court will enter a separate order denying that motion.

**Signed on February 21, 2019**



/s/ Thomas J. Tucker

**Thomas J. Tucker**
**United States Bankruptcy Judge**